IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| VS. | § | NO. 4:07-CR-187-A |
| ALLEN CARTER, ET AL. | § | |

MEMORANDUM OPINION
and
ORDER

After having studied the transcript of the trial of defendant SHANE SMITH ("Smith") that resulted in the verdict of the jury that Smith was guilty of the offenses charged against him by Counts One, Two, Three, and Four of the superseding indictment in the above-captioned case, the court has concluded that Smith's motion for new trial should be denied.

I.

The Concerns Expressed by the Court
in the July 3, 2008, Order

Before going to a discussion of the reasons why the court has concluded the motion should be denied, the court first is discussing the two issues about which the court expressed concern in the order the court signed in this case on July 3, 2008.

The first concern had to do with the fact that the court's erroneous evidentiary ruling followed after improper conduct on the part of the prosecutor, Robert A. Klinck, ("Klinck") in

asking a question of witness Allen Carter ("Carter") that he knew or should have known was beyond the scope of direct examination of Carter by Smith's attorney, Brett D. Boone, ("Boone").[1] See July 3, 2008, Order at 4-6.[2] Klinck's question set in motion the events that led to the court's error in denying Boone the opportunity to cross-examine Carter for the purpose of impeaching his testimony that he was selling drugs for Smith at the Farnsworth address. Id. The court has concluded that the conduct of Klinck is not a factor that should enter into the decision as to whether a new trial should be granted. The court's error in denying Boone the opportunity to cross-examine Carter on the basis of Carter's prior inconsistent statements is a ground of Smith's motion for new trial, not Klinck's conduct in

---

[1] After having considered all of the purported justifications given by the government for Klinck's conduct, Government's Mem. filed July 15, 2008, at 8-18, the court remains persuaded that Klinck engaged in improper conduct when he asked Carter who he was selling drugs for out of the Farnsworth house almost immediately after he had been told by the court that a question asking about Smith's drug dealings was beyond the scope of the direct examination of Carter.

[2] The court has noted that it incorrectly used the name "Smith" rather than the name "Villarreal" in the sentence in the approximate middle of page 4 of the court's July 3, 2008, order. The sentence should read: "He was careful to limit the scope of the questioning to the subject of an altercation with witness Danny Villarreal that Villarreal had either denied occurred or denied remembering."

asking the question that led to the answer Boone sought to impeach.

The other matter of concern mentioned in the July 3 order has to do with what significance, if any, the court should attach to the contentions of the government concerning the proof it would have made in response to impeachment of Carter if the court had allowed the impeachment. The court has concluded that in determining whether the motion for new trial should be granted it should not attach any significance to the government's representations as to the proof it would have made if the impeachment had been allowed. Otherwise, the court would be engaging in pure speculation as to what might have happened.

II.

Reasons Why the Motion is Being Denied

A.  Standard to be Applied.

Rule 52(a) of the Federal Rules of Criminal Procedure directs that "[a]ny error . . . that does not affect substantial rights must be disregarded." The Fifth Circuit has said that the error of a trial court in admitting or excluding evidence affects substantial rights of a defendant if there is a reasonable possibility that the error contributed to the conviction. See United States v. Yanes Sosa, 513 F.3d 194, 201 (5th Cir. 2008);

United States v. Mendoza-Medina, 346 F.3d 121, 127 (5th Cir. 2003); United States v. Williams, 957 F.2d 1238, 1242 (5th Cir. 1992); United States v. Lay, 644 F.2d 1087, 1090 (5th Cir. Unit A May 1981).[3]

The four counts of the indictment of which the jury found Smith guilty were possession with intent to distribute cocaine (Count One), possession with intent to distribute heroin (Count Two), maintaining drug-involved premises (Count Three), and possession of a firearm in furtherance of a drug-trafficking crime (Count Four). Each offense was alleged to have occurred on or about November 14, 2007. For the reasons explained below, the court has concluded that there is no reasonable possibility that the error of the court in not allowing Boone to impeach Carter by

---

[3]The court recognizes that in United States v. Sumlin, 489 F.3d 683 (5th Cir. 2007), a panel of the Fifth Circuit said that "[a]n error affects substantial rights if there is a reasonable probability that the improperly admitted evidence contributed to the conviction." Id. at 688 (emphasis added). Presumably the Sumlin panel simply misspoke when it used the word "probability" instead of the word "possibility." In the Supreme Court decision the panel cited as authority for its "probability" language, the Court said "unless there is a reasonable possibility that the improperly admitted evidence contributed to the conviction, reversal is not required." Schneble v. Florida, 405 U.S. 427, 432 (1972) (emphasis added). The other case the panel cited in support of its use of "probability" was United States v. Williams, 957 F.2d 1328 (5th Cir. 1992), in which the Fifth Circuit used "possibility" rather than "probability." Id. at 1242.

Carter's prior inconsistent statements contributed to the jury's finding of guilt as to any of those four counts.

B.  Incriminating Evidence.

The evidence of Smith's guilt of each of the four offenses was overwhelming. In making its evaluation of the possible effect of the court's error in denying Boone the opportunity to impeach Carter, the court bears in mind that the impeachment evidence would not have been evidence of the truth of anything other than whether Carter told the truth when he said that his sales of drugs out of the house on Farnsworth were for Smith. The most that could have been accomplished by the impeachment evidence, had it been allowed, would be to cancel out Carter's answer that he was selling the drugs for Smith. The impeachment of Carter would have left unimpaired the other evidence that overwhelmingly established Smith's guilt. The following is a summary of the other incriminating evidence:

1.  Testimony of Police Officer Bruce Blaisdell.

Smith was called to the attention of law enforcement officers by an informant, Danny Villarreal ("Villarreal"), who had agreed to work as an informant for the government in order to avoid prosecution for drug activities in which he had been involved. Villarreal informed law enforcement officials that he

5

was aware of a house on Farnsworth where cocaine and heroin was being sold. He made arrangements to engage in a drug transaction at the house, and, while under surveillance on November 14, 2007, he made a drug purchase at the house.

Based on their knowledge of that purchase, police officials obtained a search warrant for the house on Farnsworth, and executed the warrant on November 14. As the officers approached the house to execute the warrant, Smith stepped from the house onto the front porch. Carter was inside the house when the warrant was executed. Significant quantities of drugs (cocaine, cocaine base, heroin, ecstasy, and marijuana) were found at various places throughout the house, along with bottles of cutting agents for the cocaine and paraphernalia normally used for the distribution of drugs. Also found was a bag containing U.S. currency as well as drugs. A loaded handgun was found in the kitchen.

2. <u>Testimony of Police Officer Steve Cox</u>.

Cox participated as a member of the Fort Worth Police Department Special Weapons and Tactics Section in the execution of the search warrant at the Farnsworth house. In the driveway of the house was a silver Ford Expedition automobile. As he approached the house, a large man appeared in the doorway. He

ordered the man to go to the ground, and he did. Cox identified Smith as the man who appeared in the doorway.

3. <u>Testimony of Police Officer Jim Grow</u>.

Grow participated in the execution of the search warrant at the Farnsworth house on November 14. During the search of the house he located a key ring on which there was a key to the silver Ford Expedition that was parked in the driveway and another to the burglar bar at the entrance to the house. The Ford Expedition key had a remote vehicle lock and unlock device. The key ring with the keys was found on a counter that separated the kitchen area from the living area in the house.

Upon searching the Ford Expedition Grow found a Social Security card, a Texas driver's license, and insurance documents all bearing the name of Smith, clipped to the visor on the driver's side of the vehicle. Smith's photograph was on the driver's license. The insurance papers showed the insured vehicle to be the Ford Expedition and the insured person to be Smith.

He also found in the vehicle a total of approximately $3,000, a document from the City of Fort Worth in reference to a delinquent account for water services showing the service address as the Farnsworth house, and a concealed bottle of a drug-cutting

agent. The cutting agent was in a bottle identical to the brand, quantity, and size of some of the bottles of cutting agents found inside the house.

4. <u>Contents of Recorded Telephone Conversations to Which Smith Was a Party</u>.

On February 12, 2008, Smith, who placed the call, had a telephone conversation with Deongela Moore. He told her that he had just learned the identity of the confidential informant, and that now that he knows who it is he cannot take the case to a jury trial. On February 15, 2008, Smith, who placed the call, had a telephone conversation with Traci Leonard. Smith said that now that he has found out the identity of the confidential informant he cannot go to trial and that the confidential informant would murder him in the courtroom because he had told the confidential informant everything.

5. <u>Testimony of Villarreal</u>.

Villarreal agreed to cooperate with the government following his arrest in 2006 for trafficking in heroin. The case against him was dismissed because he agreed to act as a confidential informant, providing the government information about drug dealers.

He first met Smith four or five years ago when he sold heroin to Smith. After he became a confidential informant, he, by coincidence, ran into Smith at a gas station. Smith asked Villarreal if he was still in business, and Villarreal responded that he would see what he could do. Villarreal reported the meeting to the Drug Enforcement Administration ("DEA"). Thereafter he talked with Smith by telephone off and on. At some point in time after he visited with Smith at the gas station, he went to an apartment where he met with Smith and other men. Heroin, crack cocaine, and regular cocaine were present in the apartment. Smith told Villarreal if he ever needed anything, he could stop by. Later Smith moved from that apartment to an apartment on Las Vegas Trail, where Villarreal visited him to see if they could set up something. The same men who were present at the first apartment were present at the Las Vegas Trail apartment when he went there. Drugs also were present at the Las Vegas Trail apartment.

Later, Smith told Villarreal that he had moved his drug operation from Las Vegas Trail to the house on Farnsworth. Smith suggested to Villarreal that he drop by the house. On a visit by Villarreal to the Farnsworth house, Smith introduced Villarreal to Carter. Villarreal had never seen Carter before. Smith told

9

Villarreal that if he ever needed anything, and if Smith was not there, he should talk to Carter, who could get him whatever he needed. He understood that Smith was referring to cocaine or heroin or crack or whatever they were selling at the time. His understanding from what Smith said was that Carter was working for Smith.

On November 14, 2007, he went to the Farnsworth house twice. The first time he went there was to set up a time when he could make a drug purchase. He and Smith agreed that he would come back around lunchtime. Smith told him that he probably would not be there, but Carter would be. When he was there he saw a pistol on the countertop, and he observed Smith move the pistol, and put it in his back pocket or back waistband.

During the day on November 14 he met with DEA agents relative to his intended drug purchase at the Farnsworth house. When he went back to the house to make the purchase, Smith was not there. He purchased small quantities of heroin and cocaine from Carter. After his purchase, he delivered the drugs he purchased to the DEA agents.

6. <u>Testimony of Police Officer Perry Moore</u>.

Moore is a Fort Worth police officer assigned to the DEA task force. He was one of Villarreal's handling officers as a confidential source for DEA.

Based on information Villarreal gave them, the DEA set up a buy through Villarreal from a mid-level heroin and cocaine trafficker Villarreal referred to as "Thumbhead." Villarreal told them that Thumbhead drove a gray Ford Expedition, and he provided them the address of the Farnsworth house as being the location where they were trafficking heroin and cocaine. Moore drove by the Farnsworth address the day before the search warrant was executed, and observed the Expedition parked outside the house.

7. <u>Testimony of ATF Agent Travis Riddle</u>.

Riddle is a special agent for the Bureau of Alcohol, Tobacco, Firearms, and Explosives. He has reviewed the forensic cell phone report from the Fort Worth police department pertaining to a cell phone that was found next to Smith at the Farnsworth house. The cell phone records indicate that Villarreal and Smith had contact by telephone leading up to November 14, 2007. Villarreal sent a text message to Smith on November 14, 2007, at approximately 11:29 saying "I'm ready," and

received a response from Smith at 11:30 saying "I am too." There was a telephone conversation between Villarreal and Smith at 11:55 on November 14.

He and Officer Grow went to the lot where Smith's Ford Expedition was impounded in order to retrieve any other documents located in the vehicle. They found a work receipt from Michael's Keys showing Smith as the customer.

When called as a rebuttal witness, Riddle testified:

Q. Agent Riddle, do you remember the debrief -- or the interview of Shane Smith that occurred back in February? I believe there were two of them.

A. Yes.

Q. What was the first question you asked the defendant in the first debrief interview?

A. How long have you been dealing out of the address on Farnsworth?

Q. What did he say?

A. One month.

Q. Did you ask him what his involvement was with the drug dealing at the house on Farnsworth?

A. I did.

Q. What did he say?

A. He advised that he would pick up the money from Farnsworth several times a week, drive it to an address, another address, in Como that -- to a subject he identified as "Lil Red," at which time the money

would be counted out. "Lil Red" was collecting the money for another dealer in Como by the name of Lishon Hudson.

Q. Did the defendant tell you whether he knew that he was part of this Lishon Hudson drug network?

A. He did.

Q. He said he was a knowing participant in it?

A. "Lil Red" or Mr. Smith?

Q. Mr. Smith.

A. Mr. Smith stated that he was.

Trial Tr. at 250-51.

8. <u>Contents of More Recorded Telephone Conversations to Which Smith was a Party</u>.

On February 15, 2008, Smith, who placed the call, had a telephone conversation with Deongela Moore. He makes comments indicating that he assumed that Carter is debriefing on him and that, if he's doing so, "he gonna blast the nigger out of the water." <u>Id.</u> at 211.

On February 19, 2008, Smith, who placed the call, had a telephone conversation with Deongela Moore. Smith told Moore to get word to Carter that he was going to trial and that Carter should not debrief. Later in the evening on February 19, 2008, Smith, who placed the call, had another telephone conversation with Moore. He said to her: "Tell him I got some good news;

13

just don't debrief. Tell him do not debrief." Id. at 212.
Also, he told her: ". . . you call Cherrie back and tell her if AC call again tonight, tell him do not debrief. They trying to nail the coffin shut on us. I found out something today about the motherf[] Danny." Id. at 213.

C. Exculpatory Factors.

The jury could well have taken Villarreal's testimony with a grain of salt, bearing in mind that he, in effect, was a hired witness for the government.[4] However, there was so much evidence substantiating Villarreal's testimony that his credibility problems most likely did not cause the jury to discredit his testimony in any material respect.

Smith pointedly denied his guilt of the offenses charged against him by Counts One, Two, Three, and Four of the indictment. He claimed that he was trying to avoid Villarreal because of information he had that Villarreal was a government

---

[4] The court does not agree with Smith's assertion that "[t]he jury rejected Villarreal's testimony regarding a firearm and found Shane Smith not guilty on Count[] [sic] Six, felon in possession of a firearm." Def.'s Mem. filed July 15, 2008, at 2. The jury note seeking clarification on the meaning of "in and affecting commerce" as that term pertained to Count Six causes the court to believe that the jury answered "not guilty" as to Count Six because of a problem it had with the "interstate commerce" element, not because the jury rejected Villarreal's testimony regarding the firearm.

14

informant, and that Villarreal kept placing calls to him, but he would not answer his phone.

Smith explained his presence at Farnsworth on November 14, 2007, by saying that his friend, Carter, called him and wanted him to come to the Farnsworth house to fix a door that could not be locked. He said that the house had been broken into, and the deadbolt on the front door was disabled so that the door could not be locked. Smith denied having been inside the house on November 14, saying that he knew that the house contained drugs, and he had been told by Carter not to go into the house.

He admitted on cross-examination that he had dealt drugs with Villarreal, including drug deals with Villarreal when Smith was on Las Vegas Trail, before he had an argument with Villarreal. With respect to the things he told agent Riddle during the debriefing, Smith explained:

> Q. Do you remember that you met with Agent Riddle and myself back in February?
>
> A. Yes, sir, I do.
>
> Q. And do you remember that we asked you some questions about your activities at Farnsworth.
>
> A. Yes, sir.
>
> Q. Do you remember Agent Riddle asking you how long had you been dealing drugs out of Farnsworth, and you answered, "About a month."

15

A. He was asking me of my knowledge. He was asking me of my knowledge of the activity at that house, and basically I will go ahead and put out there, 95 percent of everything that I told Mr. Riddle in the debriefing was because I had been informed to by a prior lawyer that had been taken off my case for incompetency. He led me and advised me to say these things to Mr. Riddle.

. . . .

THE COURT: Did you say that to Mr. Riddle?

THE WITNESS: Yes, sir.

Trial Tr. at 246-47.

D. The Error in Denying Boone's Attempt to Impeach Carter Was Harmless.

After examining the record as a whole, the court is convinced beyond a reasonable doubt that the court's error in denying Boone permission to impeach Carter was harmless. See Lay, 644 F.2d at 1090. If the impeachment had accomplished what Boone intended to accomplish, it would have erased from the evidence the last of the following questions and answers:

Q. You said you didn't get to know him well. Did you see [Villarreal] at some point after that night?

A. When I was on -- when he came to me to buy on Farnsworth.

Q. Why did you sell him drugs on Farnsworth?

A. Why did I?

Q. Yes.

16

>     A.   Because I was selling drugs out of the house.
>
>     Q.   Who were you selling drugs for?
>
>     A.   Shane Smith.

Id. at 238. If the last question and answer were removed entirely from consideration, the remaining evidence of Smith's guilt as to Counts One, Two, Three, and Four would, nevertheless, be so persuasive that there is no reasonable possibility that denial of Boone's right to impeach Smith contributed to Smith's conviction. Therefore, the court's error in denying the impeachment evidence did not affect Smith's substantial rights, and it must be disregarded. See Fed. R. Civ. P. 52(a).

E.   <u>The Ground of the Motion Based on Witness Cosandra Allen's Answers that Smith Has Been in Custody</u>.

The following exchange occurred during the testimony of defense witness Cosandra Allen ("Allen"):

>     Q.   What is your relationship with the defendant?
>
>     A.   My boyfriend.
>
>     Q.   Is he still your boyfriend?
>
>     A.   No.
>
>     Q.   But he was back in October/November of 2007?
>
>     A.   Yes.
>
>          THE COURT:  When did he quit being your boyfriend?

17

> THE WITNESS: A little bit after -- a couple weeks after, maybe.
>
> THE COURT: Couple weeks after what?
>
> THE WITNESS: After he was arrested.
>
> THE COURT: After he was arrested?
>
> THE WITNESS: Yes.
>
> THE COURT: In other words, he was your boyfriend up until he was taken into custody in this case?
>
> THE WITNESS: Yes.
>
> THE COURT: And he's been in custody ever since he quit being your boyfriend?
>
> THE WITNESS: Yes.

Id. at 228.

As the record reflects, the court asked the questions about Smith's custody status to clarify that the boyfriend/girlfriend relationship between Smith and Allen did not terminate for any reason other than that it could not possibly continue because of his custody status. Boone did not call the court's attention to any concern he had relative to the questions posed by the court to Allen, or her answers; nor did Boone request the court to give any instruction to the jury on the subject of custody.

Smith's first complaint was in the form of a ground of his motion for new trial in which he urged that the information the

jury received about Smith's custody status "was tantamount to presenting Defendant in prison clothes" and that the providing of the information to the jury was "so prejudicial as to deprive Defendant of his rights to a fair trial under the United States Constitution including but not limited to the Fifth and Sixth Amendments thereto." Mot. at 1. Smith failed to cite any legal authority in support of this ground of his motion.

The court has concluded that the "custody" ground of the motion is without merit. The concern that arises when a defendant appears at trial in his prison clothes is that the clothes serve as a constant reminder to the jury of his status. See Estelle v. Williams, 425 U.S. 501, 504 (1976). The court is satisfied in this case that the jury would have assumed that the defendant was taken into custody on November 14, 2007, and that he remained in custody thereafter. Considering the trial evidence, the court concludes that the passing reference to the defendant's custody status did not harm defendant in any respect. It certainly did not adversely affect his substantial rights.

III.

Conclusion and Order

For the reasons given above, the court concludes that the grounds of Smith's motion are without merit. Therefore,

The court ORDERS that Smith's motion for new trial be, and is hereby, denied.

SIGNED July 30, 2008.

_____
JOHN McBRYDE
United States District Judge